UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

OLENA CHUMACHENKO, on behalf of
P.B. and D.B., minor children,

        Petitioner,

  -v-                                              No.  18-CV-9728-LTS

VALENTYN BELAN,

        Respondent.

-------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

Olena Chumachenko ("Chumachenko" or "Petitioner"), a Ukrainian citizen, petitions the Court, pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"), as implemented by the International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq. ("ICARA"), seeking the return of her two minor sons to Ukraine.  The Court has jurisdiction of this matter pursuant to 22 U.S.C. § 9003.  Petitioner alleges that the two boys, P.B., age four, and D.B., age three (collectively, the "Children"),[1] who are citizens of the United States, were wrongfully removed to the United States by their father, Respondent Valentyn Belan ("Belan" or "Respondent"), who is also a Ukrainian citizen, without Petitioner's consent on or about July 22, 2018.

Petitioner filed this petition on October 23, 2018, and, on October 31, 2018, following an Order to Show Cause hearing, the Court set a schedule for expedited discovery, pre-trial submissions, and trial.  (Docket Entry Nos. 1, 3, 4, and 6.)  The parties offered direct

---

[1]     To protect the Children's identity, pursuant to Federal Rule of Civil Procedure 5.2, the Court refers to them only by their initials.

testimony in the form of written affidavits and declarations; Petitioner offered a total of seven witnesses and Respondent offered seventeen. (Docket Entry Nos. 20-26, 28-43, and 51.) The parties also submitted proposed findings of fact and conclusions of law. (Docket Entry Nos. 19 and 27.) On November 27 and 29, 2018, the Court conducted a two-day bench trial. During the trial, Petitioner cross examined four witnesses: Tae Shin, an immigration lawyer; Respondent; Alla Belan, Respondent's mother; and Nika Khrystych, Respondent's assistant, with whom Respondent also has a sexual relationship. Respondent cross-examined three witnesses: Petitioner; Anna Rogachevskaya, P.B.'s godmother and Petitioner's friend; and Anna Grushevaya, Petitioner's friend. Petitioner also testified as a rebuttal witness.

The Court observed carefully the demeanor and testimony of the witnesses and has considered carefully the parties' submissions and arguments as well as the entire evidentiary record. In accordance with Federal Rule of Civil Procedure 52(a), this Order constitutes the Court's findings of fact and conclusions of law. To the extent any finding of fact includes conclusions of law it is deemed a conclusion of law, and vice versa. For the following reasons, the petition is granted.

### FINDINGS OF FACT

The Court finds that the following facts have been proven by a preponderance of the credible evidence. Petitioner and Respondent, both of whom are Ukrainian citizens, are the parents of P.B. and D.B., who were both born in Orlando, Florida. P.B. is four years old and D.B. is three. Petitioner and Respondent began their romantic relationship in 2009 and started cohabitating in Kherson, Ukraine, in 2013, when Petitioner became pregnant with P.B. (Declaration of Olena Chumachenko ("Chumachenko Decl."), Docket Entry No. 20, ¶¶ 1-2, 4.)

In March 2014, Petitioner and Respondent traveled to Orlando, Florida to take up temporary residence in anticipation of P.B.'s birth. (Chumachenko Decl. ¶¶ 7-8.) The parties had considered other places for P.B. to be born, including Germany and Canada, but ultimately settled on the United States. (Chumachenko Decl. ¶¶ 5-6.) The Court credits Petitioner's testimony that she and Respondent decided that she would give birth to P.B. in the United States in order to take advantage of the country's medical facilities. (Trial Transcript ("Tr.") at 25.) When they arrived in Orlando, Petitioner and Respondent purchased a car and rented an apartment for an unknown duration. (Chumachenko Decl. ¶ 8; Affidavit of Respondent Valentyn Belan ("V. Belan Aff."), Docket Entry No. 28, ¶ 5.)

P.B. was born in June 2014, and the family remained in Florida until July 2014. (Chumachenko Decl. ¶¶ 9, 10.) After several weeks of international travel, the parties returned to Ukraine with P.B. in August. (Chumachenko Decl. ¶ 10; see also V. Belan Aff. ¶ 5.) When Petitioner and Respondent returned to Ukraine, Petitioner cared for P.B. full time and did not otherwise work. (Chumachenko Decl. ¶ 13.) The family reintegrated into their community, and spent significant time with their friends and family. (Chumachenko Decl. ¶ 14.)

Around February 2015, Petitioner discovered she was pregnant with the couple's second child, D.B. (Chumachenko Decl. ¶ 15; V. Belan Aff. ¶ 7.) Again, Petitioner and Respondent decided to give birth in Orlando and, in late August 2015, traveled to Florida to carry out their plan. (Trial Tr. at 32; Chumachenko Decl. ¶¶ 15, 17.) Between August 2014 and August 2015, P.B. had not traveled to the United States. (See Trial Tr. at 195.) As with P.B.'s birth, Petitioner and Respondent leased an apartment (this time, for a seven-month term), bought furniture, and purchased a car. (Trial Tr. at 33; Chumachenko Decl. ¶ 17; Petitioner's Exhibit

("Pet. Ex.") 2.) D.B. was born in December 2015 and, in January 2016, the family returned to Ukraine. (Chumachenko Decl. ¶¶ 18-19.)

Aside from recreational and routine medical-related travel abroad, P.B. and D.B. remained in Ukraine until October 2017, when Petitioner and Respondent again traveled to Orlando after learning that Petitioner was pregnant with the parties' third child. (Chumachenko Decl. ¶ 28; Trial Tr. at 103.) The Court credits Petitioner's testimony that she and Respondent discussed a permanent move to the United States around this time, but that the parties had not made a final joint decision to relocate permanently before they returned to Florida in anticipation of the birth of the third child. (Chumachenko Decl. ¶¶ 30-31.) Respondent was consistently interested in relocating to another country and preferred the United States. (See Trial Tr. at 203, 210.) The parties purchased round-trip tickets for their journey to and from Florida. (Trial Tr. at 220.) The parties removed P.B. from his preschool in the Ukraine (V. Belan Aff. ¶ 16; Affidavit of First Children Academy, Docket Entry No. 29), but in no other way cut ties with Ukraine. The parties did not sell any property in Ukraine; in particular, Petitioner did not sell her apartment. (See Trial Tr. at 115-16; Pet. Ex. 1.) Respondent did not relocate his business and, at the time they left for Florida, had not started to reorganize the business in a way that would allow him to run it remotely. (See Trial Tr. at 71-75, 205-06.) The parties left most of their possessions behind in Ukraine. (Trial Tr. at 217-19.) The parties also did not terminate the employment of their "family cook" in Ukraine and, indeed, continued to pay her salary. (Declaration of Galyna Vlasova, Docket Entry No. 23.)

When they arrived in Florida in October 2017, the parties entered into a seven-month residential lease and purchased a car and furniture, just as they had done with Petitioner's prior pregnancies, although their furniture purchases were somewhat more extensive than before.

(Chumachenko Decl. ¶ 29; Pet. Ex. 4; V. Belan Aff. ¶¶ 20-21; Trial Tr. at 55-56.) The parties enrolled P.B. in a pre-K program in Florida (Trial Tr. at 48), but neither Petitioner nor Respondent had obtained a visa that would allow them to remain in the United States legally for more than a few months (see Trial Tr. at 52, 117-18, 221). Respondent had investigated the process by which he could obtain an investor visa, but, as of the date of the trial in this matter, had never actually applied. (Trial Tr. at 207-09, 344-45.) Petitioner also had not applied for any visa, nor did the parties have any plan to marry, such that Petitioner could have benefited from any investor visa that Respondent might have been able to obtain. (Trial Tr. at 53, 117-18.) The evidence also shows that neither Petitioner nor Respondent took steps to obtain work or permission to work in the United States during this time. While Petitioner and Respondent had toured homes for sale during an earlier trip to Florida (in January 2017), the parties did not tour any homes for sale after they arrived in October 2017. (See Affidavit of Lou Supowitz, Docket Entry No. 35; Trial Tr. at 215.) The parties never purchased or placed an offer on a home in Florida. (See Trial Tr. at 116, 215-16.)

Unfortunately, Petitioner miscarried around December 2017, and the parties returned to Ukraine in late January 2018. (Chumachenko Decl. ¶ 32; Pet. Ex. 5.) They put the furniture that they had purchased in storage and left their car in the care of Belan's brother, who resides in Florida. (Trial Tr. at 60-61.) Upon their return, the Children were again enrolled in daycare and resumed activities with their family and friends. (Chumachenko Decl. ¶ 34; Pet. Ex. 6.) The parties sold their two cars, but used Respondent's company car and his mother's car instead. (Trial Tr. at 125-26.) Petitioner rented out her apartment, but moved with Respondent and the Children to another home—an apartment they purchased in Kherson. (Trial Tr. at 62, 75.) Around mid-February 2018, Respondent had to attend to proceedings in two lawsuits that

were pending in Ukraine.  (Trial Tr. at 56-57; V. Belan Aff. ¶ 25; Respondent's Exhibit ("Resp. Ex.") L.)  In March 2018, Petitioner started an interior design business in Kherson.  (Chumachenko Decl. ¶ 36; see also Trial Tr. at 63-64.)  At all relevant times, Respondent's business remained in Ukraine.  Respondent asserts that, during the spring of 2018, he was reorganizing his business so that he could run the company remotely.  (See Trial Tr. at 297-98.)  However, Respondent testified that he had not started this process until the end of 2017.  (Trial Tr. at 205-06.)  The parties did not purchase real estate in the United States after their return, but Respondent purchased a home in Hong Kong in March or April of 2018.  (Trial Tr. at 108.)  Respondent also purchased four or five apartments in Kiev, Ukraine, in June 2018.  (Trial Tr. at 228.)  At all relevant times, almost all of the parties' family members lived in Ukraine.  (See Trial Tr. at 220.)

Respondent offered several third party witnesses who testified that they had heard the parties talk prospectively about plans to move to the United States.  However, none of these witnesses testified that, in the spring of 2018, Petitioner and Respondent told them that they had already moved to the United States and were merely tying up loose ends.  To the contrary, several of Respondent's witnesses testified about the parties' ongoing efforts during the spring of 2018 to prepare for permanent relocation, indicating that the relocation had not yet been undertaken.

For example, Irina Bilenko, a real estate agent, testified that she rented out Petitioner's apartment in March 2018.  (Docket Entry No. 33.)  The parties met with an immigration attorney, Tae Shin, in January 2018, after they had already arrived in Florida.  (Docket Entry No. 41.)  According to Olga Chayka's testimony, Petitioner and Respondent were still in "planning" stages in March 2018.  (Affidavit of Olga Chayka ("Chayka Aff."), Docket

Entry No. 38.) Tatiyana Nikolaeva testified that, at the end of 2017, Respondent told her that he and Petitioner "would be residing" in the United States, not that they were already residing there. (Docket Entry No. 40.) According to Anzhelika Khomina, the parties did not ask her to "join them as an assistant [in the United States]" until June 2018. (Docket Entry No. 31.) Nika Khrystych testified that, in April and May of 2018, she helped Respondent try to secure an investor visa that would allow him to immigrate to the United States. (Affidavit of Nika Khrystych ("Khrystych Aff."), Docket Entry No. 37, ¶¶ 10, 22-23.) Ms. Khrystych also testified that the parties told her on June 23, 2018, that "they were about to move to the United States." (Id. ¶ 26.) Petitioner and Respondent did not ask Kristina Frolova to join them in the United States as their nanny until February 2018. (Docket Entry No. 34 ¶ 3.) This testimony makes it evident that, as of the spring and early summer of 2018, the parties had not relocated to the United States.

The parties' return to Ukraine following Petitioner's miscarriage marked the beginning of a particularly tumultuous period of their relationship, during which Petitioner vacillated as to whether she wanted to relocate to the United States with Respondent and the Children. Petitioner had learned of Respondent's relationships with other women in the winter of 2017. (Chumachenko Decl. ¶ 35.) In March 2018, Petitioner "had reached [her] limit" with Respondent's affairs and placed an advertisement on a dating website. (Chumachenko Decl. ¶ 37.) Months later, Respondent discovered that Petitioner herself had started a relationship with "a man who lived abroad" and, in response, Respondent moved out of their shared apartment. (Chumachenko Decl. ¶ 44; Trial Tr. at 77-78.) In late June, the parties apparently reconciled and Respondent told Khrystych, who Petitioner understood to be Respondent's girlfriend, that he "intended to stop all communication with [her] and that he was no longer interested in

[Khrystych] working for him." (Khrystych Aff. ¶ 26.)  Also in late June, Petitioner discovered that Respondent was "continuing to communicate with his girlfriend."  (Chumachenko Decl. ¶ 46.)  Nonetheless, around this time, Respondent returned to the apartment he shared with Petitioner and the parties made plans to travel together to Florida.  (Chumachenko Decl. ¶¶ 49-50.)  There is no credible evidence that the trip was jointly planned to implement permanent relocation to the United States.  The night before they were scheduled to leave for Florida, the parties "got into an argument" and Petitioner refused to go on the trip.  (Chumachenko Decl. ¶ 50.)  Respondent took the Children to Florida without Petitioner and, on July 13, 2018, returned with them to Kiev rather than Kherson.  (Chumachenko Decl. ¶¶ 50, 52.)

On July 20, 2018, Petitioner agreed to reconcile with Respondent and cease communication with the "man who lived abroad," in order to reunite as a family.  (Chumachenko Decl. ¶ 55.)  However, their reconciliation was short-lived.  On July 22, 2018, following a heated argument, Respondent told Petitioner he was taking the Children to a swimming pool in Kherson, but could not be found at the pool.  (Chumachenko Decl. ¶ 58.)  In a telephone call and text messages as he prepared to take the Children to the airport, Respondent told Petitioner that he was taking the Children to the United States, and then he took them to Los Angeles via Kiev.  (Trial Tr. at 83, 93-94, 135-36, 332-33; Pet. Ex. 13; Chumachenko Decl. ¶ 59; V. Belan Aff. ¶ 41; Stipulation of Undisputed Facts ("Stipulation"), Docket Entry No. 47, ¶ 6.)  The Court credits Petitioner's testimony that she never consented to Respondent taking the Children to the United States.  (Chumachenko Decl. ¶¶ 61-62.)  The Court does not credit Respondent's testimony that Petitioner said goodbye to the Children "knowing . . . that [their] trip to the United States was permanent."  (See V. Belan Aff. ¶ 40.)  Respondent himself testified that he and Petitioner "never discussed" living in the United States "not as a family."  (Trial Tr. at 212.)

Petitioner's lack of consent is further evidenced in her text messages to Respondent following his departure with the Children.  (See Pet. Exs. 13-15; see also Resp. Ex. R.)  For example, on July 23, 2018, Petitioner stated, "Why aren't the children staying with me?  I also want them to live with me."  (Pet. Ex. 13.)  And, on July 30, 2018, Petitioner wrote, "Why do you decide everything all the time – where to go, how long to stay," to which Respondent replied, "I have to do something, otherwise the kids will sit in Ukraine while their father and mother decide something."  (Pet. Ex. 14.)  On August 10, 2018, Petitioner stated that, "we did not have any agreement with you originally that they would be in the states without me."  (Pet. Ex. 15.)

Petitioner also testified credibly that, four days after Respondent took the Children to the United States, she contacted an attorney.  (Chumachenko Decl. ¶ 64.)  On August 17, 2018, Petitioner filed a "Request for Return of Children" with the United States Department of State (Chumachenko Decl. ¶ 67; see also Pet. Ex. 16) and, on August 21, 2018, Petitioner "filed a Hague case in the State of California" (Chumachenko Decl. ¶ 68).  From August 23, 2018, to September 8, 2018, Respondent stopped communication with Petitioner, and did not inform Petitioner of the Children's whereabouts.  (Chumachenko Decl. ¶ 70; Trial Tr. at 249-51.)

On September 24, 2018, Respondent filed an Order to Show Cause in New York State Court seeking temporary custody of the Children.  (Pet. Ex. 17.)  Respondent's state court petition included a false representation that Petitioner had abandoned the family in January 2018, and also asserted that the family had planned to relocate to the United States in the summer of 2018 (rather than in October 2017, as Respondent has maintained in these proceedings).  (Trial Tr. at 257-60.)  On October 23, 2018, Ms. Chumachenko filed a petition with this Court seeking the return of the Children to Ukraine.  (Docket Entry No. 1.)

CONCLUSIONS OF LAW

The Hague Convention, to which the United States and Ukraine are both parties, is designed to "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."  Hague Convention, Art. 1.  A person may exercise his or her rights under the Convention "by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed."  22 U.S.C.S. § 9003(b) (LexisNexis 2018).

To prevail, the petitioner must establish by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention . . . ."  22 U.S.C.S. § 9003(e) (LexisNexis 2018).  Specifically, "a petitioner under the Hague Convention must demonstrate by a preponderance of the evidence that (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention."  Hofmann v. Sender, 716 F.3d 282, 291 (2d Cir. 2013) (internal quotation marks omitted).  Here, the parties agree that Petitioner had custody rights under Ukrainian law, recognized by the Convention, which she was exercising at the time Respondent removed the Children to the United States.  (Stipulation ¶¶ 8-9.)  Therefore, the second and third elements of the above test are satisfied, and the Court is left to determine the Children's habitual residence.

Habitual Residence

To determine a child's habitual residence, the Court (i) inquires into the shared intent of those entitled to fix the child's residence at the latest time that their intent was shared, and (ii) considers whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent. Gitter v. Gitter, 396 F.3d 124, 134 (2d Cir. 2005). Respondent has not argued that the Children have become acclimatized to the United States. (See Trial Tr. at 19-20.) Since, "[n]ormally the shared intent of the parents should control the habitual residence of the child," Gitter at 134, and "a change in geography is a necessary condition to a child acquiring a new habitual residence," Gitter at 133, the Court will focus its habitual residence inquiry on whether Petitioner has proven her contention that the parties never had a shared intent to change the Children's habitual residence from Ukraine to the United States notwithstanding the family's move to Florida in October 2017 or whether, as Respondent contends, the parents formed such a shared intention prior to October 2017 and cemented it by moving to Orlando in October of that year.

To determine whether the parents shared an intent to fix the child's residence, "the court should look . . . at actions as well as declarations." Id. at 134. "Shared intent" conditioned on certain prerequisites will not fix the child's residence if those conditions do not materialize. See Mota v. Castillo, 692 F.3d 108, 115 (2d Cir. 2012) (holding that "if the parents did not agree that [the child] would live indefinitely in America regardless of her mother's presence, it cannot be said the parents 'shared an intent' . . . that America would be [the child's] state of habitual residence"); see also Hofmann, 716 F.3d at 293 (holding that habitual residence remained Canada despite children's year-long stay in New York, where father had "intended for

the children to relocate to New York on the condition that he would join the household" and the mother had filed for divorce).

Petitioner asserts that Ukraine has, at all relevant times, been the Children's habitual residence. According to Petitioner, P.B. and D.B. have "lived in Ukraine all their lives, with the exception of trips and vacations elsewhere; went to school in Ukraine; and had their home in Ukraine." (Petitioner's Proposed Findings of Fact and Conclusions of Law ("Pet. FF & CL"), Docket Entry No. 19, at 8-9.) Respondent asserts that the United States, not Ukraine, is the Children's habitual residence. According to Respondent, "[t]he parties' last shared intention as to what the children's country of habitual residence would be was the United States," and that "the parties had this last shared intention prior to their travel to the United States with the children in October 2017." (Respondent's Proposed Findings of Fact and Conclusions of Law ("Resp. FF &CL"), Docket Entry No. 27, ¶¶ 3, 45.)

Having considered thoroughly the entire record, including the written and oral testimony and all exhibits, and observed carefully the demeanor of the witnesses, the Court concludes that Petitioner has demonstrated by a preponderance of the credible evidence that Ukraine was, and remains, the Children's habitual residence. The Children have spent the overwhelming majority of their lives in Ukraine. They have attended school in Ukraine. Their friends and extended family are almost entirely in Ukraine. Their parents are Ukrainian citizens who own property and work in Ukraine. The record includes no objective evidence that the parents jointly decided to abandon Ukraine as their home or to relocate the Children to another country regardless of the domicile of one or both parents. The credible testimonial evidence regarding the parents' subjective intentions persuades the Court that, while Respondent was

determined to relocate the Children, with or without Petitioner, permanently to another country, Petitioner never shared that firm, unconditional intention.

Respondent argues that the parties intended their trip to the United States in October 2017 to be a permanent relocation. Petitioner, on the other hand, testified credibly that they had only considered, and had not yet decided on, permanent relocation by that time. Petitioner had also explicitly placed certain preconditions on any potential relocation: she "told [Respondent] that if [they] were going to move as a family and secure immigration visas to allow [them] to move, [they] would have to get married first. It was also understood that [Petitioner] would have to stop having relationships outside of [their] relationship." (Chumachenko Decl. ¶ 25.) Evidence proffered by both Petitioner and Respondent supports this testimony. For example, one of Respondent's witnesses—Nika Khrystych, who was, for years, intimately involved with Respondent (see Trial Tr. at 216-17, 230-31)—testified that "Ms. Chumachenko personally told [her] several times [that] she, Mr. Belan and the children would be moving as a family unit to the United States." (Khrystych Aff. ¶ 19.) Respondent himself also testified that he and Petitioner "never discussed" living in the United States "not as a family." (Trial Tr. at 212.) Nothing in the record indicates that any of Petitioner's conditions were met.

Respondent has failed to rebut Petitioner's credible testimony that the parties intended the October 2017 trip to be a temporary stay for the limited purpose of giving birth, just as they had done on two prior occasions. For example, in November 2017, the parties signed a seven-month lease, which they had also done in connection with D.B.'s birth. (Pet. Ex. 4; Resp. Ex. F.) This relatively short lease term, combined with the fact that the parties did nothing to secure any permanent residence, belies Respondent's testimony that they intended to settle in Orlando permanently. The parties did nothing to obtain long-term visas or employment in the

United States before departing for Orlando, nor were they apparently authorized to work here. Respondent testified that he reorganized his business so he could run it remotely, but he also testified that he had not started this process until the end of 2017—after they had supposedly already relocated. (Trial Tr. at 205-06, 297-98.)

When they arrived in Orlando in the fall of 2017, the parties lacked any visa or immigration status that would allow them to remain in the United States permanently. (Trial Tr. at 117, 221.) Respondent testified that he had explored obtaining an investor visa before October 2017, but he never actually applied for one. (Trial Tr. at 207-09, 344-45.) Even as of the date of the trial in this matter, Respondent had still not applied for the investor visa. (Trial Tr. at 345.) Petitioner has not applied for an immigrant visa, nor did she apply to adjust her immigration status while she was in the United States. In order for Petitioner to gain the advantages attendant to any investor visa issued to Respondent, Petitioner and Respondent would need to be married. (Trial Tr. at 53, 117-18.) There is no evidence that the parties had any plans to marry at any time relevant to this proceeding. The ineligibility of the parents to remain in the United States permanently as of October 2017 supports the conclusion that the parents did not, in fact, share a joint intention to relocate at that time.

Respondent offered several third-party witnesses to support his claim that he and Petitioner intended to move permanently to the United States in October 2017. However, the Court finds that this testimony does not provide credible support for Respondent's contention. For example, Aleksandr Krutienko's written testimony is almost word-for-word identical to that of Yuriy Golovchenko. (See Docket Entry Nos. 43 and 51.) Tatiyana Nikolaeva's testimony attributes to Respondent (not Petitioner) a statement that he and Petitioner would be residing in the United States. (See Docket Entry No. 40.) Other witness statements either fail to

demonstrate personal knowledge of the facts to which they testify, or they lack specificity regarding statements and conduct of Petitioner, whose intentions are at issue here. For example, Maksym Yudin, who is Respondent's brother, testified that "[t]hey spoke about their plans to reside [in Orlando]" (Docket Entry No. 36), but offers no detail about what, specifically, "they" said, when "they" said it, or whether Petitioner herself actually made any such statements. The same is true regarding the testimony of Tae Shin (Docket Entry No. 41) (testifying that "[t]hey explained that they had come to live in the United States with their children"), and Tatiyana Nikolaeva (Docket Entry No. 40) (testifying that the parties declined to open an account at her new bank because "they would soon be returning to the United States with their childen"). Ekaterina Kozlova testified that she "knew that Mr. Belan and Ms. Chumachenko had moved to the USA at or around October 2017" (Docket Entry No. 32), but failed to offer any basis for her knowledge. Similarly, Olga Chayka testified that she "recognized that Ms. Chumachenko and her family have plans to move to USA for permanent life" (Chayka Aff. ¶ 3), without specifying how she came to "recognize" those plans or what she understood about the nature of those plans.[2]

When Petitioner unfortunately miscarried at the end of 2017, the family returned to Ukraine, just as they had done after Petitioner's prior pregnancies. (Chumachenko Decl. ¶ 32.) The credible evidence shows that the parties were returning home: the Children were reenrolled in a childcare program, Petitioner started a Ukraine-based design business, and the Children resumed activities with their friends and family. (Chumachenko Decl. ¶¶ 34, 36.)

---

[2] It is also notable that Chayka represents that her connection with the Respondent's company did not commence until March 2018, well after the date on which Respondent contends that the family had already acted on a permanent relocation to the United States. (Chayka Aff. ¶ 3.)

Respondent's business remained in Ukraine and, rather than purchasing property or establishing any business ties in the United States, he purchased five apartments in Kiev. (Trial Tr. at 228.)

Moreover, the parties' continued work to further their plans during the spring of 2018 demonstrates that their permanent relocation had not been accomplished in October 2017. The parties were still investigating viable immigration methods, Respondent was reorganizing his business, and the parties were scouting potential assistants to accompany them to the United States. Indeed, Respondent has admitted before another tribunal that there was no relocation as of October 2017, and admitted at the trial of this action that he had lied to the New York State Court in which he commenced his ex parte custody proceeding. By Respondent's own sworn account as filed in the New York State Court custody action, he and Petitioner had not relocated as of October 2017; instead, they "fully intended to relocate with the children together during the summer of 2018." (Pet. Ex. 17 at 5.) According to Respondent's testimony in New York State Court—testimony that was admittedly only "50 percent" true (Trial Tr. at 263)—he and the Children relocated to the United States on July 2, 2018. (Pet. Ex. 17 at 6.)

Respondent's contentions that Petitioner had agreed that the Children should be relocated to the United States regardless of the status of their parents' relationship, and that Petitioner consented to his unilateral relocation of the Children are fatally undermined by the implausibility of the proposition that Petitioner would have intended the Children to move to the United States without her, given her role as the Children's primary caregiver and Respondent's acknowledgment that Petitioner "always want[ed] to see the children." (Trial Tr. at 246.) And Petitioner's actions show that her intent was quite the opposite: Petitioner engaged an attorney just four days after Respondent removed the Children to the United States, filed a "Request for

Return of Children" with the United States Department of State, filed a lawsuit in California, and sought relief from this Court soon thereafter. (See Chumachenko Decl. ¶¶ 64, 67-68.)

The credible evidence demonstrates that the parties did not jointly decide to move permanently to the United States in October 2017, were not prepared or able to stay in the United States permanently when they arrived in October 2017 and that, at best, they were considering whether to move to the United States as a family at some time in the future. The evidence also shows that Petitioner and Respondent never shared an intent to permanently move the Children to the United States outside the confines of an intact family unit. Respondent, alone, moved the Children. Therefore, the Court concludes that Petitioner has met her burden of proving that Ukraine remains the Children's habitual residence. See Hofmann, 716 F.3d at 292.

Affirmative Defense of Consent

Article 13 of the Convention identifies affirmative defenses to a claim of wrongful removal of a child from the habitual residence. Article 13 provides that the Court is not bound to order the return of children if the respondent establishes by a preponderance of the evidence that the petitioner "consented to or subsequently acquiesced in the removal or retention." Hague Convention, Art. 13. This affirmative defense should be narrowly applied: "even where the grounds for one of these 'narrow' exceptions have been established, the district court is not necessarily bound to allow the child to remain with the abducting parent." Sanguineti v. Boqvist, 2015 WL 4560787, at *17 (S.D.N.Y. July 24, 2015) (quoting Blondin v. Dubois, 189 F.3d 240, 246 n.4 (2d Cir. 1999)). Respondent asserts that Petitioner consented to his taking the Children to the United States to establish permanent residence here.

When considering whether the petitioner consented to the removal, "it is important to consider what the petitioner actually contemplated and agreed to in allowing the

child to travel outside its home country," taking into account "[t]he nature and scope of the petitioner's consent, and any conditions or limitations." Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005) (citation omitted). "The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention." Id.

Respondent has failed to prove by a preponderance of the credible evidence that Petitioner consented to his removing the Children from Ukraine for the purpose of permanent relocation. In support of his consent defense, Respondent relies primarily on his own self-serving testimony and the testimony of Respondent's mother, Alla Belan. (See V. Belan Aff.; Affidavit of Alla Belan ("A. Belan Aff."), Docket Entry No. 30.) In addition to being self-serving, Respondent's testimony is inconsistent. On one hand, he says that Petitioner consented to his relocating the Children to the United States without her (see V. Belan Aff. ¶¶ 39-40), but on the other, he says it took "several weeks" before "it was clear that Ms. Chumachenko would not join [Respondent and Children]" in New York (id. ¶ 41). Further, Ms. Belan did not testify that she heard Petitioner affirmatively consent to Respondent's taking the Children to the United States, rather she testified that Petitioner "did not tell [Respondent] not to go or act in any way surprised that [Respondent and Children] were going." (A. Belan Aff. ¶ 11.).

Respondent's departure to the United States was immediately followed by contemporaneous text messages from Petitioner protesting Respondent's actions, lamenting his unilateral decision to take the Children away from her, and refusing to write a letter allowing the Children to live with Respondent. (See Pet. Exs. 13-15.) Petitioner did not just verbally protest Respondent's actions, she also took swift legal action against him, filing petitions for the return of the Children with the State Department, in California, and with this Court. Petitioner's actions

immediately following Respondent's departure corroborate her denial that she consented to permanent removal to a country in which she had no right to reside, and there is no objective evidence of any express consent to Respondent's actions.

The Court concludes that Respondent has failed to prove by a preponderance of the credible evidence that Petitioner consented to Respondent's removal of the Children to the United States for permanent residence.

CONCLUSION

For the foregoing reasons, the Court concludes that Petitioner has proven by a preponderance of the evidence that (i) the Children were at all relevant times habitual residents of Ukraine; (ii) the removal of the Children from Ukraine violated Petitioner's custody rights under the law of Ukraine; and (iii) that Petitioner was exercising these rights at the time of the Children's removal. The Court further concludes that Respondent has not proven by a preponderance of the evidence his defense under Article 13(a) of the Convention, i.e., that Petitioner consented to the Children's removal. Therefore, Petitioner has proven that the Children were wrongfully removed to and retained in the United States by Respondent, and her Petition for Return of the Children to Ukraine is granted.

This case, which concerns the removal of the young Children from the country that was their home, is almost concluded. It is, however, only a building block in the construction of a proper foundation for the Children's future lives. They are loved and wanted by both parents. The Court urges the parents, as they prepare arrangements for the return and care of the children, to make working together to ensure that these young boys can live in an atmosphere of love and emotional security, whether or not the family is ultimately reunited, their highest priority.

The parties are directed to appear for a conference with the Court on **December 11, 2018, at 2:00 p.m.** in Courtroom 17C to establish the timing and circumstances for the return of the Children to Ukraine.

Petitioner is directed to make any motion for attorneys' fees and expenses pursuant to Article 26 of the Convention and 22 U.S.C. § 9007(b)(3) by way of motion practice pursuant to Federal Rule of Civil Procedure 54(d), which must be commenced no later than 14 days following the entry of judgment. Respondent is directed to file his opposition papers, if any, within 14 days thereafter. Costs shall be taxed in accordance with Federal Rule of Civil Procedure 54(d).

SO ORDERED.

Dated: New York, New York
December 7, 2018

    /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge